**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SOUTHPORT TELEDATA, INC., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NOVA CONTACT CENTER PLATFORMS, | : | |
| INC., et al, | : | |
| Defendants | : | NO.  05-cv-0030 |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND VERDICT OF THE COURT

PRATTER, DISTRICT JUDGE                                     AUGUST 29, 2006

Plaintiff Southport Teledata Systems, Inc. ("Southport") alleges that Defendants Nova

Contact Center Platforms, Inc. ("Nova CCP") and Nova CTI (collectively, "Nova") breached a

telemarketing contract by failing to pay for the services provided by Southport.  Southport bears

the burden of proof by a preponderance of the evidence with respect to its breach of contract

claim.  In this non-jury trial, the Court was the sole judge of the credibility of the various

witnesses who testified in this matter.  The Court's findings, conclusions, and verdict are set

forth below.

**FINDINGS OF FACT**

   **A.  THE PARTIES**

   1.       Southport is a Canadian corporation with its principal place of business in

Markham, Ontario and is in the business of providing telemarketing services.  Stipulated Fact ¶

2.

   2.       Nova CCP is a Nevada corporation authorized to conduct business in the

Commonwealth of Pennsylvania and is in the business of providing telemarketing services.
Stipulated Fact ¶ 2.

3.      Nova CTI is a Pennsylvania corporation authorized to conduct business in the
Commonwealth of Pennsylvania and is in the business of providing telemarketing services.
Stipulated Fact ¶ 2.

**B. THE SERVICE AGREEMENT AND ADDENDA**

4.      On or about February 6, 2004, Nova CCP and Southport entered into the Service
Agreement.  Stipulated Fact ¶ 1; Plaintiff's Exhibit 1.

5.      The Service Agreement provided, *inter alia*, that "[f]rom time to time, Nova
would like to hire Southport to fulfill some of the business commitments Nova has made to its
customers.  In this case, Southport will become Nova's telemarketing vendor."  Stipulated Fact ¶
3; Plaintiff's Ex. 1.

6.      The Service Agreement further provided that "[w]ith each project, Nova will need
to provide to Southport a document describing the compensation method, compensation payment
schedule and terms of payment.  Southport will need to sign this document as an acceptance of
the project."  Stipulated Fact ¶ 5; Plaintiff's Ex. 1.  That is, the material terms of any particular
project were left to future negotiation, i.e., addendum agreements.  Plaintiff's Ex. 5(b).

7.      The addenda to the Service Agreement contained such information as the client
name, project name, compensation method, compensation rate, billing terms, start and end dates,
telemarketing targets, whether recording was to take place, the reporting requirements, and a
notes section.  Plaintiff's Exs. 1, 5(b); N.T. 3/22/06 at 90.

8.      Southport performed telemarketing services pursuant to the Service Agreement

and addenda received from Nova CTI and signed by Southport.  Stipulated Fact ¶ 6; N.T. 3/22/06 at 113-14;

9.     Nova CCP is a signatory to the Service Agreement.  Nova CTI is the signatory to the addenda.  Plaintiff's Exs. 1, 5(b).

10.     Southport performed telemarketing services under the Service Agreement and addenda for the following client campaigns: Institutional Investors (New Names); Institutional Investors (Paid Subscriptions); Institutional Investors (Paid Web); Institutional Investors (Renewal); Engineering News Record Magazine; BCA Magazine; Health News Daily; Power Magazine; PSD; MCA Magazine; Blue Sheet; Fairfield; and Sears Carpet.  Stipulated Fact ¶ 7; Plaintiff's Ex. 2.

11.     The telemarketing services provided by Southport included dialing from a list of names and telephone numbers, reading from a script provided by Nova CCP and/or Nova CTI aimed at renewing magazine subscriptions, obtaining new subscriptions, selling products and/or conducting surveys, and submitting reports to Nova CTI.  Stipulated Fact ¶ 4; N.T. 3/22/06 at 31-32, 66-67, 179-80.

12.     The Service Agreement provided that "Southport agrees to furnish Nova with reports on a daily basis on all active projects."  Stipulated Fact ¶ 9; Plaintiff's Ex. 1.

13.     The Service Agreement provided that "[i]n the event of termination of services, Southport shall receive compensation on all agreed-to billable work."  Stipulated Fact ¶ 11; Plaintiff's Ex. 1.

14.     Southport provided daily and weekly reports as well as export files to Nova. Stipulated Fact ¶ 9; N.T. 3/22/06 at 35-37, 71, 114-15; N.T. 3/28/06 at 58-59.

15.    Southport invoiced Nova CTI for the work completed.  N.T. 3/22/06 at  88, 104.

16.    Southport received compensation from Nova CCP and Nova CTI  for some of

the telemarketing services provided for a total of $93,020.14.  Stipulated Fact ¶ 11; N.T. 3/28/06

at 85-86.

17.    Nova CCP and Nova CTI have refused to compensate Southport for other

invoices presented by Southport totaling $95,031.31.  Stipulated Fact ¶ 12; Plaintiff's Ex.2; N.T.

3/22/06 at 102.

18.    Specifically, Nova CCP and Nova CTI have failed to remit payment to Southport

for the following invoices and campaigns:

      a.    Invoice No. 04-0408 (Institutional Investors - Renewal)
      b.    Invoice No. 04-0411 (Institutional Investors - Renewal)
      c.    Invoice No. 04-0501 (Institutional Investors - New Names)
      d.    Invoice No. 04-0502 (Institutional Investors - Paid Subscriptions)
      e.    Invoice No. 04-0503 (ENR Magazine)
      f.    Invoice No. 04-0504 (BCA Magazine)
      g.    Invoice No. 04-0505 (Health News Daily)
      h.    Invoice No. 04-0507 (Institutional Investors - Paid Web)
      i.    Invoice No. 04-0508 (ENR Magazine)
      j.    Invoice No. 04-0509 (BCA Magazine)
      k.    Invoice No. 04-0511 (Power Magazine)
      l.    Invoice No. 04-0601 (ENR Magazine)
      m.    Invoice No. 04-0602 (BCA Magazine)
      n.    Invoice No. 04-0603 (Institutional Investors - Renewal)

Plaintiff's Ex. 2.

19.    Despite the fact that Nova CCP and/or Nova CTI received no complaints, and

received full payment, from its clients as a result of the telemarketing services provided by

Southport, Nova has refused to remit payment to Southport for the following invoices and

campaigns:

a.    Invoice No. 04-0503 (ENR Magazine)
b.    Invoice No. 04-0504 (BCA Magazine)
c.    Invoice No. 04-0505 (Health News Daily)
d.    Invoice No. 04-0508 (ENR Magazine)
e.    Invoice No. 04-0509 (BCA Magazine)
f.    Invoice No. 04-0511 (Power Magazine)
g.    Invoice No. 04-0601 (ENR Magazine)
h.    Invoice No. 04-0602 (BCA Magazine)

Stipulated Fact ¶ 13; Plaintiff's Ex. 2; N.T. 3/22/06 at 117-18; N.T. 3/28/06 at 66-67.

### C. The Institutional Investors Campaigns

20.    On or around February 9 and March 3, 2004, Southport and Nova CTI entered into addenda to the Service Agreement whereby Southport agreed to provide telemarketing services for the Institutional Investors Renewal and New Names campaigns. Plaintiff's Exs. 1, 5(b). The New Names addendum and the Service Agreement were sent under cover letter on letterhead which contained the combined logo for both Nova CTI and Nova CCP. Plaintiff's Ex. 5(b). The letter, dated February 9, 2004, listed the address for Nova CTI and was signed by Mr. Greg Schwartz as "President." Id. The correspondence, in pertinent part, reads, "[p]lease note the attached Service Agreement. . . . In addition is an Addendum for our first project together, Institutional Investors. Id.

21.    The addenda provided that Southport was to be compensated on a "per qualified" basis, meaning compensation was to be provided for each customer from whom data was collected, and not at an hourly rate. Plaintiff's Exhibit 5(b); N.T. 3/22/06 at 66, 187-88.

22.    The addenda also provided that Southport was obligated to provide daily and weekly cumulative reports as well as a weekly data export file. Plaintiff's Exhibit 5(b).

23.    The addenda further provided that the telemarketing calls by Southport were not

5

scheduled to be recorded.  Plaintiff's Exhibit 5(b).

24.     The addendum for the Institutional Investors Renewal Campaign required that the script to be used by the telemarketers be "approved by the BPA," or the Business of Performing Audits Worldwide. Plaintiff's Exhibit 5(b); see www.bpai.com.  The Institutional Investors New Name campaign did not contain such a requirement.  Plaintiff's Ex. 5(b).  John Spencer, Chief Technical Officer of Nova CTI, was responsible for sending the scripts to the BPA for approval, and the scripts for the Institutional Investors campaigns were approved.  N.T. 3/28/06 at 12.

25.     In February 2004, Southport began preliminary work on an Institutional Investors campaign.  N.T. 3/22/06 at 22-23, 128; N.T. 3/28/06 at 17, 70.  Nova CTI sent Southport the applicable scripts and computer program which was to run the script for the telemarketers.  N.T. 3/22/06 at 67; N.T. 3/28/06 at 14, 43, 45, 48, 50.  Nova representatives visited the Southport calling facility and were well aware of Southport's technical capabilities.  N.T. 3/28/06 at 73. Nova reviewed the data to ensure its accuracy, and found that Southport performed the test with 100% accuracy because all of the data fields were filled in.  N.T. 3/22/06 at 116, 148; N.T. 3/28/06 at 70.

26.     With respect to the Institutional Investors New Names and Renewal campaigns, Southport understood that the objective of the telemarketing calls was for its telemarketers to obtain permission to send a free magazine subscription (a "sale") to, and, if possible, obtain demographic information from each recipient of calls.  N.T. 3/22/06 at 23-25, 28-29, 42-43, 51, 52, 54.

27.     Nova believed that it had hired Southport to conduct a "controlled subscription" campaign, which required Southport to collect "key" demographic information for marketing

6

purposes, and that the no-cost magazine subscription was given in exchange for participating in, and giving answers to, the entire survey.  N.T. 3/22/06 at 150-51, 159-60; N.T. 3/28/06 at 13.

28.     The Service Agreement and the addenda do not indicate Southport's specific obligations with respect to data gathering.  That is, the Service Agreement and addenda do not indicate whether Southport was obligated to collect data for all of the demographic questions asked or whether Southport was only to attempt to obtain demographic information.  Plaintiff's Exs. 1, 5(b); N.T. 3/22/06 at 184-86.

29.     Until June 2004, Southport and Nova never discussed the issue of whether the objective of the telemarketing campaign was to make the sale of the no-cost magazine at any expense, i.e., without obtaining all of the demographic information if the business called by the telemarketer refused to answer those questions.  N.T. 3/22/06 at 78-79, 84-85; N.T. 3/28/06 at 28.

30.     Southport followed the scripts provided by Nova and filled in the demographic information received from the businesses that were called.  If the businesses did not provide an answer to a demographic question, the telemarketers left the answer field blank.  N.T. 3/22/06 at 69-71.

31.     Nova asserts that it was impossible for the Southport telemarketers to leave an answer blank because the Nova computer program which "ran" the script would produce an "error" message if a telemarketer moved past that screen without providing an answer to the question.  N.T. 3/28/06 at 15, 45-48, 53-54.

32.     Nova argues that Southport should have known of the obligation to answer every demographic question because the Renewal Campaign Addendum required the script to be

"approved by the BPA" and BPA guidelines require the script to provide every option available to the telemarketing agent, and that if an option is not chosen, the telemarketer cannot move past the screen.  N.T.  3/28/06 at 46.

33.     Nova also argues that Southport should have been aware of the necessity of answering every demographic question because Southport employee Gregory Ellis, who was the manager in charge of training and supervising the Southport telemarketers, participated in Institutional Investors campaigns while previously employed by a different company and was aware of Nova and Institutional Investor's specifications, as well as the BPA guidelines.  N.T. 3/22/06 at 106-07, 116, 131, 147-48, 153, 155, 185, 186-87, 189, 192; N.T. 3/28/06 at 46, 73.

34.     Southport did not have direct contact with Institutional Investors.  N.T. 3/22/06 at 52, 100; N.T. 3/28/06 at 26, 60.

35.     Southport provided its services in accordance with the instructions received from Nova.  N.T. 3/28/06 at 91-92.

36.     Initially, Nova CTI had difficulty opening the data export files that Southport sent at the end of every week.  N.T. 3/22/06 at 37; N.T. 3/28/06 at 20, 21, 54-55.  Those formatting issues were resolved by Southport and Nova CTI, and Nova CTI  was then able to access the data provided by Southport.  N.T. 3/22/06 at 39, 105-106; N.T. 3/28/06 at 21-22, 56-58, 62.

37.     Both during and after the occurrence of the formatting issues, Nova accepted all of the daily reports and export files and Southport continued telemarketing on the Institutional Investors campaign.  N.T. 3/28/06 at 20; N.T. 3/28/06 at 55-56, 61-62.

38.     Nova reviewed the daily status reports and had the opportunity to review the data export files.  N.T. 3/22/06 at 130-31, 147, 175, 59, 60-61.

8

39.     Southport invoiced Nova CTI approximately every two weeks for the Institutional

Investors campaigns, and Nova CTI and/or Nova CCP generally paid those invoices within 30 to

45 days.  N.T. 3/22/06 at 91; N.T. 3/28/06 at 85-86.  Southport invoiced Nova CTI for work

done, and Nova paid those invoices through approximately May 26, 2004.  N.T. 3/22/06 at 41,

92, 104, 146; N.T. 3/28/06 at 60, 64.

40.     Southport continued making its calls on the campaign and sent daily reports and

export files.  N.T. 3/22/06 at 35-37, 41; N.T. 3/28/06 at 55, 58-59.

41.     Nova continued to send Southport phone contacts to dial and continued accepting

the daily reports and export files.  N.T. 3/22/06 at 40; N.T. 3/28/06 at 55, 58-59.

42.     Nova CCP and Nova CTI made payments to Southport for specific invoices.  N.T.

3/28/06 at 84-87.  That is, Southport sent numbered invoices to Nova CTI, which invoices were

paid by Nova CCP and Nova CTI with notations indicating which invoice number the payments

were satisfying.  Id.

43.     In April 2004, Nova sent the export data to Institutional Investors.  N.T. 3/22/06 at

151.  Institutional Investors subsequently notified Nova that there was a problem with the data in

that some data fields were missing information.  N.T. 3/22/06 at 152, 180.

44.     In or around May and June 2004, near the end of the telemarketing campaign,

Nova complained to Southport that the issue with the files was not formatting error, but rather

that demographic information was missing from the population fields because it had not been

captured by the Southport telemarketers.  N.T. 3/22/06 at 40-42, 52-53, 55, 58, 59-60, 61, 98-

100, 205, 145; N.T. 3/28/06 at 25, 77-78.

45.     Southport analyzed the data and determined that the demographic fields for which

the telemarketers obtained information from the businesses were properly populated.  <u>N.T.</u>
<u>3/22/06 at 62, 107</u>.

46.     Up until the time when Nova allegedly discovered problems with the data,
Nova paid Southport for the work it had performed.  <u>N.T. 3/22/06 at 41, 106</u>.

47.     After Nova complained to Southport regarding the quality of the data provided,
Southport re-called approximately 2,000 customers to obtain further demographic information
and sent the re-call data to Nova.  <u>N.T. 3/22/06 at 42, 58, 107-08, 181, 183-84</u>; <u>N.T. 3/28/06 at</u>
<u>24, 38</u>.  Nova analyzed the data collected on the re-call campaign and determined that 40% of the
entries did not have the desired demographic information.  <u>N.T. 3/28/06 at 38</u>.

48.     Ultimately, Nova conducted an in-depth analysis of the data files for the Renewal
and New Names campaigns and determined that approximately 80 to 90% of the files were
"useless" for its purposes.  <u>N.T. 3/22/06 at 164</u>.  Specifically, Nova CTI employee John Spencer
examined both the Renewal and New Names data files and determined that 95% of the Renewal
file was unuseable and 40% of the records in the New Names account were likewise unuseable.
<u>N.T. 3/28/06 at 35-37</u>.

49.     Nova asserts that Institutional Investors paid for some of the data supplied
by Nova, but withheld some payment from Nova ostensibly based on Southport's deficient work.
<u>N.T. 3/22/06 at 134-35</u>.  Nova did not present any evidence quantifying the amount of monies
withheld from it by Institutional Investors or which data Institutional Investors accepted and/or
rejected.  <u>N.T. 3/22/06 at 135-40</u>.

50.     Nova applied monies already paid to Southport on other campaigns to the
Institutional Investors campaigns with which Nova was dissatisfied.  Specifically, Nova had

already partially paid Southport for the "bad data," but had not paid Southport for work done that was acceptable to Nova and its other clients, and for which Nova had been paid by those clients. N.T. 3/22/06 at 122, 123, 125-26.  Nova did not notify Southport that it intended to "offset" the Institutional Investors campaign payments against work performed by Southport which was acceptable to Nova.  N.T. 3/22/06 at 127.

**CONCLUSIONS OF LAW**

**A.  Jurisdiction and Breach of Contract Claim**

1.      Jurisdiction in this case is appropriate pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.

2.      Under Pennsylvania law, a plaintiff asserting a breach of contract claim must establish (1) the existence of a contract, including its essential terms (i.e., the parties' obligations); (2) breach of a duty imposed by the contract; and (3) resulting damages.  See, e.g., Hart v. Arnold, 884 A.2d 316, 332 (Pa. Super. Ct. 2005).

3.      As an initial matter, the Nova Defendants allege that Southport is unable to maintain a cause of action for breach of contract against Nova CCP because Nova CCP was not a party to the addenda.

4.      "It is fundamental contract law that one cannot be liable for a breach of contract unless one is a party to that contract."  Electron Energy Corp. v. Short, 597 A.2d 175, 177 (Pa. Super. Ct. 1991) (citations omitted).  Pursuant to Pennsylvania law, a corporation is generally regarded as a "separate and independent entity," even when corporations are structurally affiliated.  Commonwealth Vienna Health Prods., Inc. v. Downs, 726 A.2d 432, 434 (Pa. Commw. Ct. 1999); Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 643 (3d

Cir. 1991).

5.      Here, the operative agreements between the parties are the Service Agreement and addenda.  As stated above, on or about February 6, 2004, Nova CCP and Southport entered into a Service Agreement wherein Southport agreed to become Nova CCP's telemarketing vendor on an as-needed basis.  On or around February 9, 2004 and March 3, 2004, Southport and Nova CTI, a company directly affiliated with Nova CCP, entered into addenda to the Service Agreement between Nova CCP and Southport for Institutional Investors campaigns, whereby Southport became Nova CCP's telemarketing vendor.  The New Names campaign addenda as well as the Service Agreement were sent to Southport under cover letter on letterhead which contained the combined logo of Nova CCP and Nova CTI.  The addenda contained the specifications of the telemarketing campaigns to be performed as contemplated by the Service Agreement.  Nova CTI provided the scripts and technical support for the telemarketing campaigns, and Southport sent numbered invoices Nova CTI for the telemarketing work completed.  Nova CTI and Nova CCP both paid those invoices pursuant to the terms of the Service Agreement.  The Court finds that, on these facts, and having conducted themselves in an interchangeable fashion, Nova CCP and Nova CTI were both parties to the telemarketing contracts pursuant to which Southport performed telemarketing services and for which Nova CCP and Nova CTI benefitted.  Thus, Nova CCP cannot argue that it is not liable to Southport under the contracts.

6.      The Nova Defendants argue that the work done and payments made to Southport were "lumped" together such that it is impossible to determine which invoices were paid for and which were not, and Nova has only paid Southport for good work performed and does not owe it anything for the allegedly inadequate Institutional Investors work.  The evidence,

however, contradicts this assertion because, as stated above, Southport sent numbered invoices to Nova CTI based on particular work performed, and Nova CTI and Nova CCP sent payments referencing the particular invoice numbers which the payments were satisfying. Moreover, the parties agree that Southport performed all of its duties and obligations for certain campaigns and invoices for which Nova CCP and Nova CTI have not paid Southport. See, *supra*, Factual Finding ¶ 19. Nova CCP and Nova CTI did, however, pay Southport for invoiced work performed on the Institutional Investors campaigns, which payments the Nova Defendants now assert should not have been made based on Southport's deficient performance. The Nova Defendants argue that they are entitled to invoke a self-help offset to apply payments made to Southport on the Institutional Investors campaigns against the outstanding invoices because Southport breached the Renewal and New Names contracts by failing to perform its duties adequately.

7.    With respect to the terms of the agreements, the parties disagree as to Southport's responsibilities under the Service Agreement and Renewal and New Names addenda. Southport asserts that, pursuant to the agreements, its obligations were to dial from a list of phone numbers and names supplied by the Nova Defendants, capture the businesses' answers to the scripted questions, and send daily reports and weekly data export files containing the captured information to Nova CTI. In contrast, the Nova Defendants argue that Southport was obligated to collect "key" demographic data in accordance with industry (BPA) standards, which required the telemarketers to capture and enter demographic information for every question in the script.

8.    The Nova Defendants first assert that the term "[s]cript must be approved by the BPA" contained in the Institutional Investors Renewal Campaign is the provision pursuant

to which Southport was contractually obligated to collect data for every question posed to the businesses called.  The Nova Defendants essentially argue that the term requiring the script be "approved by the BPA" is ambiguous and must actually be read to require that the script must be carried out within BPA standards, which supposedly require every question to be answered and entered by the telemarketer.

9.     While Pennsylvania courts will strive to "ascertain and give effect to the intent of the contracting parties" when the obligations assumed by a party to a contract are not clear, that process would also allow for interpreting the terms "according to the meaning that would be ascribed to them by a reasonable third party."  See Hart, 884 A.2d at 332.

10.    The writing itself is presumed to contain the mutual intent of the parties to a written contract, and extrinsic evidence to determine the parties' intent may only be examined where ambiguity is present.  Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3d Cir. 1995).

11.    Extrinsic evidence may be used to support a party's claim of ambiguity, but the "evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract."  Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 93 (3d Cir. 2001).

12.    Ambiguity will be found to exist if, after considering the language of the contract, the meanings suggested by the parties and their counsel, and the extrinsic evidence offered in support of each interpretation, the court finds that the terms in question are susceptible to reasonable alternative interpretations.  Einhorn v. Fleming Foods of Pa., Inc., 258 F.2d 192, 194 (3d Cir. 2001).

13.     In analyzing whether an ambiguity exists in the contract, it is not permissible for the court to analyze the parties' subjective intent.  Rather, the court's analysis of the existence of ambiguity is confined to the parties' "linguistic reference;" the expectations of the parties, "standing alone, are irrelevant without any contractual hook on which to pin them."  Bohler-Uddeholm Am., Inc., 247 F.3d 79 at 93 (citation omitted).

14.     The documents at issue here between the parties are the Service Agreement and addenda for the Institutional Investors Renewal and New Names Campaigns.  On its face, the Service Agreement does not contain any terms regarding the applicability of "BPA standards" or the requirement that Southport telemarketers collect data for every demographic field.  Likewise, the Institutional Investors New Names Campaign addendum does not contain any provision with respect to the "BPA standards" or data collection obligations.  The Institutional Investors Renewal Campaign Addendum does not state with specificity Southport's obligations regarding collecting data for all of the demographic fields, but the document does provide that the script used by Southport to collect the data from customers must be "approved by the BPA."

15.     The provision found only in the Renewal Campaign Addenda requiring that the "[s]cript must be approved by the BPA," by its plain language, does not require anything more of the parties than to have the script approved by the BPA.  It says nothing about any data collection obligations.  The provision on which Nova tries to afix a "contractual hook" has not been shown to be ambiguous in that it is not on its face susceptible to reasonable alternative interpretations.  Moreover, to the extent that Nova argues that extrinsic evidence, including the BPA guidelines, show that "script approval" requires the telemarketers to carry out the script in accordance with "BPA standards" to require all demographic questions to be answered, that argument must fail

because Nova has not offered any evidence, other than its own otherwise unsupported assertions, of what constitutes BPA, or other industry, standards.  Beyond that fundamental point, there is no evidence in the record to support a finding that Southport would or should have had such an understanding.  Independent research has also failed to uncover a BPA standard obligating a telemarketing firm working from a BPA approved script or even on a "controlled subscription" campaign to collect data for every question demographic posed to the businesses called.

16.     In the alternative, Nova argues, as Gregory Schwartz, president of Nova CTI and Nova CCP, testified, that the obligations of Southport telemarketers to obtain data for every question was intentionally omitted from the "shorthand" addenda because of the past relationship with Mr. Ellis as a call-room manager, but that the obligation of Southport to collect data for each question posed was "spoken about and understood by everyone."  N.T. 3/22/06 at 186.

17.     As noted above, the agreements are silent as to Southport's specific performance obligations beyond performing the telemarketing and transmitting the reports and data to Nova. However, from the testimony of Mr. Schwartz that the additional data collection obligation was "spoken about and understood by everyone," it is not clear whether that extra-contractual "agreement" arose before or contemporaneously with the signing of the addenda or whether the supposedly agreed upon demographic data collecting obligation and procedure occurred after the parties entered into the addenda.

18.     In general, the parol evidence rule precludes the parties to a contract from introducing evidence of prior or contemporaneous oral agreements to vary the terms of a written agreement.  Mellon Bank v. First Union Real Estate, 951 F.2d 1399, 1405 (3d Cir. 1991).  The parol evidence rule only applies if the written agreement is a final and complete expression of the

parties' intent.  Id.  The question of whether a writing is a fully integrated is a question of law to be answered by the court.  Id.  In determining whether the parties' agreement is final and complete, the court must compare the written agreement with the alleged extra-contractual agreement.  Id.  (quoting Gianni v. R. Russel & Co., 126 A. 791, 792 (Pa. 1924).  In comparing the two, the court must consider:

> whether the parties, situated as were the ones to the contract, would naturally and normally include the one in the other if it were made. If they relate to the same subject matter, and are so interrelated that both would be executed at the same time and in the same contract, the scope of the subsidiary agreement must be taken to be covered by the writing.

Id.  Thus, the Court must determine whether the Service Agreement and addenda, which only required that Southport provide telemarketing services and send captured data to Nova in daily reports and weekly data export files, represented the complete and final agreement of the parties.

19.     Here, the oral "agreement" (i.e., the "understanding") allegedly relates to the performance obligations of Southport to ask all questions in the scripts supplied by Nova CTI, to capture an answer to every question and to enter those complete data sets into the data export files.  The written agreement does not provide specific data collection performance requirements. Although it appears to the Court that the parties in this action would "normally and naturally" include the specific duties and requirements for collecting data to be ultimately compiled into the data export filed and sent to Nova, it is equally as clear that the operative documents are completely lacking specific, definable standards for telemarketing other than that telemarketing is to occur and Southport must send reports and data export filed to Nova.  For example, the agreements lack a provision stating that the telemarketers are supposed to even follow a script

17

supplied by Nova, a term which all of the parties agree was part of their agreements.  Because the alleged oral agreement and written agreement do not go directly to the same subject matter (i.e., Southport's data collection responsibilities), nor do they directly contradict each other, the Court will consider the extrinsic evidence presented to determine the intent of the parties regarding whether there was an agreement as to Southport's specific data collection and recording obligations.

20.     Here, as stated above, Nova CTI and Nova CCP's president, Mr. Schwartz, testified that Southport's obligation to conduct a "controlled subscription campaign" and capture complete demographic data  was "spoken about and understood by everybody."  N.T. 3/22/06 at 186.  Mr. Schwartz failed, however, to identify the persons with whom such conversations were held, what specifically was said during those alleged conversations, and whether those persons had the authority to bind Southport to any performance agreement.  Mr. Schwartz further stated that he "had every hope and expectation that this work would be done as [Mr. Ellis, not then employed by Southport,] had done for [Nova] in the Caribbean."  N.T. 3/22/2006 at 147.  Mr. Schwartz also testified that, particularly after the testing period where Southport completed the testing with 100% accuracy, Nova "had no reason to believe that anything but excellent work was going to be done."  N.T. 3/22/06 at 148.

21.     In contrast, Southport presented the credible testimony of Mr. Gregory Ellis, who managed and trained the telemarketers and who worked on other Nova projects while being employed for a non-party telemarketing company in the Caribbean.  See, *supra*, Factual Finding ¶ 33; N.T. 3/22/06 at 16-17.  Mr. Ellis testified that his understanding of the campaigns was that the telemarketers were to qualify the customers to receive a magazine subscription and to collect

the demographic information as a secondary issue. <u>N.T. 3/22/06 at 23-28</u>.  Mr. Ellis believed that

the telemarketers were never to risk losing a "sale" by pressing the customer for demographic

information which was not forthcoming.  <u>Id.</u>  Mr. Ellis further credibly testified that he was never

informed by Nova that Institutional Investors required all of the demographic information to be

collected and entered.  <u>N.T. 3/22/06 at 78-79, 84-85</u>.

22.     Although Nova may have had hopes, expectations, and reasons to believe that

Southport would elicit and record particular data, the evidence presented does not establish that

Nova and Southport entered into an agreement whereby Southport obligated itself to capture and

report all demographic responses to the questions in the script.  The Nova Defendants,

sophisticated entities with able representation, could well have protected themselves by

documenting such a term with Southport whereby Southport would be responsible for collection

the "key" demographic information, especially given that Nova now describes that function as

being of such import.  The Court cannot hold Southport to an obligation to which it did not

assent, and, thus, the Court finds that Nova has failed to carry its burden of showing that

Southport agreed to obtain complete demographic data for all of the businesses called in

accordance with a "controlled subscription" campaign.

23.     To the extent that Nova contends that the addenda requiring only telemarketing

and transmission of collected data to Nova was orally modified after the signing of the addenda

to contain terms of performance, the parol evidence rule is inapplicable.  <u>Hampden Real Estate,</u>

<u>Inc. v. Metropolitan Management Group</u>, No. 04-2500, 142 Fed. Appx. 600, 2005 U.S. App.

LEXIS 16113, at *5 (3d Cir. Aug. 4, 2005).  Written agreements may be modified by a

subsequent written or oral agreement and the "modification may be shown by writings or by

words or by conduct or by all three." Id. (quoting Kersey Mfg. Co. v. Rozic, 215 A.2d 323 (Pa. Super. Ct. 1965)).  However, the oral modification "must be proven by 'clear, precise and convincing evidence.'" Id. at *7 (quoting Fina v. Fina, 737 A.2d 760, 765 (Pa. Super. Ct. 1999)).

24.     Here, the Court finds that Nova has failed to prove by "clear, precise and convincing evidence" that the agreement, which originally did not contain a provision requiring Southport to enter data for every question posed to the businesses, was modified through discussions between the parties wherein the parties agreed that Southport telemarketers must capture complete answers from all businesses Southport called.  Specifically, as stated above, despite the testimony of Nova CTI employee John Spencer that the issue was discussed and understood by everyone, Mr. Spencer failed to identify the persons with whom such conversations were held and whether those persons had the authority to bind Southport to any modifications.  Mr. Schwartz likewise did not testify that Nova entered into a "controlled subscription" campaign with Southport.  Furthermore, the Court credits the testimony of Southport employee Gregory Ellis, who testified that he was not informed of Nova's need to have Southport collect and enter answers for every demographic question.  Thus, the Court finds that there was no subsequent modification or other agreement between the parties for Southport to collect and report data for all demographic fields.

25.     Based on the above, the Court finds that Southport has shown by a preponderance of the evidence that Southport properly performed its obligations pursuant to the Service Agreement and the Institutional Investors Renewal and New Names campaigns addenda.  That is, the Nova Defendants have admitted that Southport sent daily reports and weekly export data to Nova CTI which contained data collected by Southport, albeit not all the information Nova

would have desired to be collected.  The Nova Defendants agree that they had ample time and

opportunity to rectify any technical problems with the file as well as to inspect the data included

in the file.  The Court understands the practicalities of the situation as presented by Nova,

specifically with respect to the initial problems for Nova with opening the data files as well as the

thousands of pages of data contained in the files, but those were not problems caused by

Southport.  The Nova Defendants have also clearly expressed during the trial the importance of

the demographic data to its client, Institutional Investors.  The Court, however, can not re-write

the contract or agreements between the parties to protect the Nova Defendants from their failure

to specify the performance obligations of their vendor, Southport.  The Nova Defendants, at their

own peril, omitted what has ultimately come to be a critical term, and the law would not hold

Southport responsible for that omission.

   26. Southport has also shown that Nova partially paid it for services rendered on

the Institutional Investors campaigns (i.e., for the purported "bad data") by specifically paying

those invoices, but, in breach of the agreements, has failed to pay Southport for the invoices

relating to campaigns which the parties agree were properly performed by Southport.  Nova

argues that it is entitled to off-set monies paid on the Institutional Investors campaigns based on

Southport's inadequate performance against the campaigns where Southport properly performed

but was not compensated.  As stated above, Nova has failed to show that Southport did not

properly perform its data gathering duties for the Renewal and New Names campaigns pursuant

to the Service Agreement and addenda.  Moreover, the Nova Defendants have failed to

adequately quantify the amount of set-off.  Although Nova attempted to provide evidence of the

number of data sets which were incomplete and did not meet its standards, Nova failed to

produce any evidence showing which data sets were unacceptable to Institutional Investors for which Institutional Investors refused to compensate Nova.  Thus, the Court finds that the Nova Defendants breached their agreements with Southport by failing to pay for services rendered on the various telemarketing campaigns in the amount of $95,031.31.  See, *supra*, Factual Finding ¶ 17.

27.     Under Pennsylvania law, in breach of contract cases, interest is available as a matter of right at the rate of six percent per annum.  Nutrition Mgmt. Servs. v. Harborside Healthcare Corp., 2005 U.S. Dist. LEXIS 9407, at *8-9 (E.D. Pa. 2005); 41 PA. CONS. STAT. ANN. § 202.  Prejudgment interest is not punitive but rather compensates a prevailing plaintiff for the loss of use of the money owed.  Colletti v. Amex Life Assur. Co., 2001 U.S. Dist. LEXIS 24199, at *5 (E.D. Pa. 2001).  The right to prejudgment interest is a legal one, and it "begins at the time payment is withheld after it has been the duty of the debtor to make such payment." Fernandez v. Levin, 548 A.2d 1191, 1193 (Pa. 1988).

28.     Here, the terms of the payment agreement between the Nova Defendants and Southport required the invoices to be paid within 30 days.  Nova has failed to pay the following invoices, and prejudgment interest shall be calculated from the date on which payment for each individual invoice became due:

|     | Invoice No. | Amount | Invoice Date | Due Date |
|-----|-------------|--------|--------------|----------|
| a.  | No. 04-0408 | $22,726.70 | April 16, 2004 | May 16, 2004 |
| b.  | No. 04-0411 | $3,100.80 | April 30, 2004 | May 30, 2004 |
| c.  | No. 04-0501 | $2,596.00 | May 3, 2004 | June 2, 2004 |
| d.  | No. 04-0502 | $6,268.46 | May 7, 2004 | June 6, 2004 |
| e.  | No. 04-0503 | $3,903.27 | May 21, 2004 | June 20, 2004 |
| f.  | No. 04-0504 | $1,964.55 | May 21, 2004 | June 20, 2004 |
| g.  | No. 04-0505 | $853.22 | May 21, 2004 | June 20, 2004 |

|   |   |   |   |   |
|---|---|---|---|---|
| h. | No. 04-0507 | $91.30 | May 31, 2004 | June 30, 2004 |
| i. | No. 04-0508 | $7,172.97 | May 31, 2004 | June 30, 2004 |
| j. | No. 04-0509 | $3,581.13 | May 21, 2004 | June 20, 2004 |
| k. | No. 04-0511 | $27,870.04 | June 3, 2004 | July 3, 2004 |
| l. | No. 04-0601 | $7,656.18 | June 8, 2004 | July 8, 2004 |
| m. | No. 04-0602 | $891.87 | June 8, 2004 | July 8, 2004 |
| n. | No. 04-0603 | $6,354.81 | June 14, 2004 | July 14, 2004 |

29.     In addition to prejudgment interest, Southport has also requested the imposition of attorney's fees.  Generally, the "American Rule" prohibits the shifting of attorneys' fees, and Pennsylvania law does not allow for recovery of fees absent "an express statutory authorization, a clear agreement by the parties or some other established exception."  Merlino v. Delaware County, 728 A.2d 949, 951 (Pa. 1999).  Southport argues that it is entitled to attorneys' fees pursuant to the Service Agreement, which provides that "Southport and the [sic] Nova shall indemnify each other from any and all liability, cost, legal fees and/or damages associated with or arising from Southport's activities in connection with this Agreement."  Notably, this provision does not contain a qualification based on the outcome of the case (i.e., the party against whom judgment is entered is obligated to pay the prevailing party's costs and fees).  This provision is typical for protecting a party that becomes embroiled in third party litigation as a result of the contractual relationship.  Were the Court to apply this provision to the facts of this case, as Southport asks it to do, an almost absurd result would be reached because, reading the provision literally, Southport would be liable for Nova's attorney's fees, just as Nova would be liable for Southport's.  The Court finds that there was no "clear intent of the parties" to have that outcome or to assess costs and fees emanating from this dispute, and therefore declines to award attorneys' fees in this matter.

**CONCLUSION**

For the foregoing reasons, the Court concludes that Southport has shown that Nova CCP and Nova CTI breached the telemarketing agreements pursuant to which Southport performed telemarketing services and the Nova Defendants failed to render payment.  Accordingly, judgment in the principal amount of $95,031.31, with six percent simple per annum interest to be calculated from the due dates of the various unpaid invoices, will be entered in favor of Southport.  An appropriate Order follows.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

24

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SOUTHPORT TELEDATA, INC.,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **NOVA CONTACT CENTER PLATFORMS,** | : | |
| **INC., et al,** | : | |
| **Defendants** | : | **NO.  05-cv-0030** |

**ORDER**

AND NOW, this 29th day of August, 2006, upon consideration of the evidence presented
at the trial of this matter, it is hereby ORDERED that judgment in ENTERED in favor of
Plaintiff Southport Teledata, Inc. and against Defendants Nova Contact Center Platforms, Inc.
and Nova CTI in the principal amount of $95,031.31, with six percent simple per annum
prejudgement interest payable as to each unpaid invoice calculated from the due date.  The
parties shall confer and agree upon the interest calculation and submit it to the Court within 14
days of the date of this Order.  The parties are to bear their own respective fees and costs of this
suit.

The Clerk of Court is directed to enter judgment in favor of Southport Teledata, Inc. in
accordance with this Order and to mark this case as closed.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE